**FIFTH DIVISION**
**PHIPPS, P. J.,**
**DILLARD and PETERSON, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**September 27, 2016**

# In the Court of Appeals of Georgia

A16A0899. ESTATE OF MILTON THEOPHILUS POND, II.

DILLARD, Judge.

The probate court granted Milton Pond guardianship of his 21-year-old son, M. P., who is a person with autism.[1] Yolanda Pond, Milton's former wife and M. P.'s mother, appeals that decision, arguing that the court erred in finding that it had personal jurisdiction over M. P., granting guardianship to Milton absent clear and

---

[1] The Court is aware that there is disagreement within the Autism and Autistic communities over whether to use person-first language (*e.g.*, "person with autism") or identity-first language (*e.g.*, "autistic person") when referring to people with autism. We have chosen to use person-first language throughout this opinion in order to emphasize, first and foremost, the humanity and inherent dignity of M. P. *See generally* AUTISM SPEAKS, *About Autism: What You Need to Know*, https://www.autismspeaks.org/sites/default/files/afyo_about_autism.pdf. (last visited September 13, 2016). Nevertheless, we understand and respect the views of those who prefer identity-first language and in no way mean to cause offense in using person-first language.

convincing evidence in his favor, and applying the incorrect standard of proof for selection of a guardian. For the reasons set forth *infra*, we affirm.

The record shows that M. P., Milton and Yolanda's adult son, was diagnosed with autism when he was three years old. In 1997, Yolanda was granted physical custody of M. P., and since that time, he has lived with his mother during each school year in Fayetteville, North Carolina, and with his father and stepmother during the summer in Savannah, Georgia. But in 2015, when M. P. was 20 years old, he refused to return to North Carolina after spending the summer with his father in Georgia. And on August 25, 2015, Milton filed a petition for guardianship of M. P.[2] in Chatham County, Georgia, asserting that guardianship was necessary because M. P. "lacks sufficient capacity to make or communicate significant responsible decisions concerning his . . . health or safety." In the petition, Milton claimed that, while M. P. "can make some of his own decisions at times, . . . he needs ongoing guidance." Specifically, Milton indicated that his reasons for seeking guardianship of his son were that M. P. needed ongoing training for independent living with daily assistance,

---

[2] Milton's wife, M. P.'s stepmother, joined Milton's petition for guardianship, but she is not a party to this appeal because guardianship was granted solely to Milton.

safety supervision while cooking, assistance with physical medical and mental-health decisions, as well as assistance with other quality-of-life decisions.

Thereafter, the trial court ordered that M. P. be evaluated by a doctor in connection with Milton's request for guardianship. In addition, upon Milton's request, the court appointed an attorney/guardian ad litem to represent M. P. in this matter. Subsequently, in compliance with the court's order, the doctor evaluated M. P. and submitted a detailed report, in which he concluded that M. P. was incapacitated by reason of autism-spectrum disorder and met the standard necessary for granting a guardianship. Then, shortly after the doctor submitted his report, Yolanda, proceeding *pro se*, filed an objection to Milton's guardianship petition, contending that she had raised their son for 20 years, detailing some of the activities that he had participated in while living with her in North Carolina, and claiming that M. P. only lived in Georgia with his father during the summer.

Next, M. P.'s attorney submitted a report, in which he agreed with Milton that, due to M. P.'s autism, he cannot make or communicate *significant* responsible decisions for his own health and safety. The attorney further reported that he had met with M. P. outside of Milton's presence, and during the meeting, M. P. was "adamant that he wanted to remain with his father so that he could participate in outside

3

activities." According to the attorney, M. P. stated that, when he was living in North Carolina with his mother, he was "unable to participate in activities and spent most of his time at home alone." Although M. P.'s statements conflicted with those of his mother, the attorney found him to be "very credible." As a result, M. P.'s attorney concluded that it would be in M. P.'s best interests for his father to be appointed as his guardian.

Having then obtained counsel, Yolanda filed an amended objection to the guardianship petition, contending that the (Georgia) probate court lacked personal jurisdiction over M. P. because he was domiciled in North Carolina. Nevertheless, after holding a hearing on the matter, the probate court rejected those arguments and appointed Milton as M. P.'s guardian, noting that he was "suitable and available to serve." This appeal by Yolanda follows.

At the outset, we note that in reviewing an order on a petition for guardianship, we will not set aside the probate court's findings "unless they are clearly erroneous[,] [a]nd [when] such findings are supported by any evidence, they will be upheld on appeal."[3] The probate court's application of the law, however, is subject to *de*

---

[3] *In the Interest of Cash*, 298 Ga. App. 110, 110 (679 SE2d 124) (2009) (punctuation omitted); *see also In re Estate of Price*, 324 Ga. App. 681, 681 (751 SE2d 487) (2013) ("Where a probate court sits as a finder of fact, we accept its

*novo* review.[4] With these guiding principles in mind, we turn now to Yolanda's specific claims of error.

1. Yolanda first argues that the probate court erred in finding that it had personal jurisdiction over M. P. for purposes of ruling on Milton's guardianship petition.[5] We disagree.

findings if they are supported by any evidence.").

[4] *See In re Estate of Price*, 324 Ga. App. at 681.

[5] Yolanda suggests, in the alternative, that, even if the probate court had personal jurisdiction over M. P., it nevertheless erred by not dismissing Milton's petition on the ground of forum *non conveniens* because "the locale in which [M. P.] has spent most of his life would be the jurisdiction where most of the evidence as to his present condition would be located," *i.e.*, North Carolina. In relevant part, OCGA § 9-10-31.1 (a) provides:

> If a court of this state, *on written motion of a party*, finds that in the interest of justice and for the convenience of the parties and witnesses a claim or action would be more properly heard in a forum outside this state or in a different county of proper venue within this state, the court shall decline to adjudicate the matter under the doctrine of forum non conveniens.

(emphasis supplied). Here, Yolanda never moved the probate court, in writing or otherwise, to dismiss Milton's petition on the ground of forum *non conveniens*. Instead, at the hearing, she proposed that any ruling on Milton's guardianship petition be "held in abeyance to see what other things might happen." And when the court asked Yolanda if she had any authority to support this request, she answered that she

5

We first note that, in reviewing a lower court's ruling on the existence of personal jurisdiction, this Court resolves all disputed issues of fact "in favor of the party asserting the existence of personal jurisdiction, bearing in mind that it is the movants who bear the burden of proving that Georgia courts lack personal jurisdiction over them."[6] And under OCGA § 29-4-1 (a), a court "may appoint a guardian for an adult only if the court finds the adult lacks sufficient capacity to make or communicate significant responsible decisions concerning his or her health or safety." Furthermore, guardianship petitions must be filed

> in the court of the county in which the proposed ward is domiciled or is
> found, provided that the court of the county where the proposed ward is

---

had no authority, other than her testimony that she planned to file a guardianship petition in North Carolina. Additionally, it is unclear why witnesses from North Carolina would need to testify regarding M. P.'s "present condition" when all parties stipulated that he was in need of a guardian, and the only issue before the court was whether to grant guardianship *to Milton*, the petitioner. Finally, it is worth noting that, although Yolanda has repeatedly suggested before the probate court and on appeal that she would be a *better* guardian for M. P. than Milton, she never filed a petition for guardianship, and she has never claimed that Milton is unfit to be M. P.'s guardian.

[6] *Lima Delta Co. v. Glob. Aerospace, Inc.*, 325 Ga. App. 76, 76 (752 SE2d 135) (2013) (punctuation and citation omitted); *see also Beasley v. Beasley*, 260 Ga. 419, 420 (396 SE2d 222) (1990) ("Our precedents establish that a defendant who files a motion to dismiss for lack of personal jurisdiction has the burden of proving lack of jurisdiction."); *Easterling v. Easterling*, 231 Ga. 90, 90 (200 SE2d 267) (1973) (same); *Smith v. Smith*, 223 Ga. 551, 551 (156 SE2d 916) (1967) (same).

found shall not have jurisdiction to hear any guardianship petition if it appears that the proposed ward was removed to that county solely for the purposes of filing a petition for the appointment of a guardian.[7]

As to determining a person's domicile, OCGA § 19-2-1 provides:

(a) The domicile of every person who is of full age and is laboring under no disability is the place where the family of the person permanently resides, if in this state. If a person has no family or if his family does not reside in this state, the place where the person generally lodges shall be considered his domicile.

(b) The domicile of a person sui juris may be changed by an actual change of residence with the avowed intention of remaining at the new residence. Declaration of an intention to change one's domicile is ineffectual for that purpose until some act is done in execution of the intention.

As our Supreme Court has explained, "[t]here must be a concurrence of actual residence and the intention to remain[ ] to acquire a domicile." If a *person actually removes to another place*, with the intention of remaining there for an indefinite time

---

[7] OCGA § 29-4-10 (a). We note that, here, there has been no allegation that M. P. was "removed" to Chatham County, Georgia, solely for Milton to file a guardianship petition.

as a place of fixed domicile, such place becomes his domicile."[8] Indeed, there must be "either the tacit or the explicit intention to change one's domicile before there is a change of legal residence."[9] Nevertheless, a person who is "mentally incompetent and who moves from one place to another *may* lack the mental capacity to change his or her domicile."[10] Lastly, we note that the question of domicile is "a mixed question of law and fact, and is ordinarily one for [the fact-finder], and should not be determined by the court as a matter of law except in plain and palpable cases."[11]

In the case *sub judice*, the undisputed evidence shows that M. P., who is no longer a minor, has an actual residence in Chatham County, Georgia, with his father, and he has explicitly expressed an intention to stay there. Specifically, according to Milton, M. P. *refused* to return to North Carolina in August 2015, after spending the

---

[8] *Midkiff v. Midkiff*, 275 Ga. 136, 137 (1) (562 SE2d 177) (2002) (punctuation omitted); *accord Conrad v. Conrad*, 278 Ga. 107, 108 (597 SE2d 369) (2004).

[9] *Kean v. Marshall*, 294 Ga. App. 459, 461 (1) (669 SE2d 463) (2008); *accord In the Interest of Hodgman*, 269 Ga. App. 34, 35-36 (1) (602 SE2d 925) (2004).

[10] *Sorrells v. Sorrells*, 247 Ga. 9, 12 (3) (274 SE2d 314) (1981) (emphasis supplied); *accord In the Interest of Hodgman*, 269 Ga. App. at 36 (1).

[11] *Campbell v. Campbell*, 231 Ga. 214, 215 (1) (200 SE2d 899) (1973) (citations omitted); *accord Dozier v. Baker*, 283 Ga. 543, 544 (2) (661 SE2d 543) (2008).

summer in Savannah. Additionally, M. P.'s attorney reported that M. P. was "adamant" that he wanted to remain in Georgia with his father, and the attorney found M. P. to be credible. Under such circumstances, even if M. P. was previously domiciled in North Carolina, there was ample evidence to support the probate court's finding that M. P. had changed his domicile to Chatham County, Georgia, by the time of this proceeding because he had moved to Chatham County, where he had an actual residence, and he explicitly expressed his intention to remain there.[12]

Nevertheless, Yolanda argues that M. P. lacked the mental capacity to change his domicile from North Carolina to Georgia. And in support of this contention, she notes that the doctor's report found that M. P. was "naive[,] suggestible, and vulnerable to the influence of others," and that she and her sister had trouble communicating with M. P. when he was in his father's care (and testified to this effect before the probate court). We find this argument unavailing. Although the probate

---

[12] *See supra* note 8 & accompanying text; *see also Black v. Black*, 292 Ga. 691, 692-93 (1) (740 SE2d 613) (2013) (explaining that "to show . . . domicile, the petitioner must prove that he maintained actual residence in Georgia during the relevant time and that he had an intent at that time to remain in Georgia indefinitely" and noting that appellate courts must accept a lower court's factual findings regarding domicile if there is any evidence in the record to support them); *Padron v. Padron*, 281 Ga. 646, 646 (641 SE2d 542) (2007) ("Domicile is established by actual residence with the intent to remain there for an indefinite time.").

9

court, in granting the guardianship petition, necessarily found that M. P. "lacks sufficient capacity to make or communicate significant responsible decisions concerning his . . . health or safety,"[13] there was evidence to support the court's conclusion that M. P. was not *so mentally incapacitated* that he was incapable of changing his domicile. In fact, during the hearing, Yolanda's counsel represented to the probate court that she "in no way contends that [M. P.] is incompetent in terms of what we usually think of as an incompetent person." Instead, her position was just that M. P. "labors under a significant disability due to his autism."

Additionally, in expressing his "adamant" desire to remain in Georgia to his attorney, M. P. was able to articulate some of the reasons underlying his decision. Specifically, M. P. indicated that he wanted to stay with his father so that he could participate in outside activities, explaining that, in North Carolina, he was unable to participate in such activities and spent most of his time at home alone. And when M. P.'s attorney was specifically asked by the probate court about M. P.'s mental ability to change his domicile, the attorney responded that M. P. "very clearly intended to move to Savannah, Georgia," "he was very lucid . . . that he wanted to be [t]here," and his decision to move was voluntary. Indeed, based on his interview with M. P.,

---

[13] *See* OCGA § 29-4-1 (a).

counsel believed that M. P. was "*very competent* to express his intention to remain in Chatham County."[14]

Furthermore, despite some of M. P.'s educational challenges related to autism, the doctor who evaluated him found that he would be "a good candidate to eventually live in a group home and learn a repetitive job skill." And as to M. P.'s decision-making abilities, Milton testified that he did not need to make M. P.'s decisions for him, but rather, Milton intended only to "coach" his son to make better decisions. In fact, Milton testified that if M. P. changed his mind about where he wanted to live, he would be free to "go wherever he wants," but that Milton had filed the petition for guardianship in Georgia because his son had expressed a desire to live there. Given the foregoing, we simply cannot say that there was no evidence to support the probate court's finding that M. P. had the mental capacity to change his domicile.[15]

Nevertheless, to support her apparent argument that an individual who satisfies the standard for guardianship is necessarily mentally incapable of changing his or her

---

[14] Emphasis supplied.

[15] We reiterate that we must defer to a lower court's factual findings regarding domicile, which is a mixed question of law and fact, except in plain and palpable cases. *See Cook v. Bd. of Registrars of Randolph Cty.*, 320 Ga. App. 447, 449 (740 SE2d 223) (2013). And in light of the evidence detailed *supra*, this is not such a case.

11

domicile, Yolanda relies on cases in which the ward at issue, unlike M. P., was found

to be "mentally incapacitated" or "mentally incompetent."[16] For example, in *Sorrells*

*v. Sorrells*,[17] the Supreme Court of Georgia held merely that a person who is mentally

incompetent and moves from one place to another *may* lack the mental capacity to

change his or her domicile.[18] And although the Court in *Sorrells* did not provide

specific details regarding the ward's mental capabilities, it noted that she was

"mentally incompetent" and physically unable to care for herself.[19] Under such

circumstances, the Court held that there was sufficient evidence to authorize the fact-

finder to conclude that the ward lacked the requisite mental capacity to acquire a new

---

[16] *See, e.g.*, *In the Interest of Hodgman*, 269 Ga. App. at 35-36 (1) (holding that, due to "debilitating injuries" that the ward sustained in a car accident, she was "mentally incapacitated," and therefore, she lacked the capacity to change her legal residence); *Wilson v. Willard*, 183 Ga. App. 204, 206 (3) (358 SE2d 859) (1987) (holding that a ward lacked the capacity to change his domicile after a stroke rendered him "mentally incapacitated"); *Stanfield v. Hursey*, 36 Ga. App. 394, ___ (3) (136 SE 826) (1927) (holding that, after a resident of Georgia was "adjudged insane," he was incapable of changing his domicile). As noted *supra*, Yolanda, through her counsel, conceded that M. P. was not mentally incompetent "in terms of what we usually think of as an incompetent person."

[17] 247 Ga. 9 (274 SE2d 314) (1981).

[18] *See id.* at 12 (3).

[19] *See id.* at 9-10.

domicile of choice.[20] Nevertheless, nothing in *Sorrells* or the other cases cited by Yolanda suggests that a person who qualifies for guardianship is *always* "mentally incompetent" to change his or her domicile. And here, as explained *supra*, there is evidence to support the probate court's finding that M. P., who undoubtedly faces certain challenges due to his autism, was not so mentally impaired that he lacked capacity to choose Georgia as his domicile.[21]

2. Next, Yolanda argues that the probate court erred in granting guardianship to Milton in the absence of clear and convincing evidence in his favor. Again, we disagree.

As to this claim of error, Yolanda is mistaken that there must be "clear and convincing evidence" to establish that a petitioner is suitable to be appointed guardian. Instead, the clear-and-convincing-evidence standard applies to the court's

---

[20] *See id.* at 12 (3).

[21] Because we affirm the probate court's finding that M. P. is domiciled in Chatham County, we need not address Yolanda's argument that M. P. was not "found in" Georgia within the meaning of OCGA § 29-4-10 (a), which provides that a guardianship petition must be filed in the county in which "the proposed ward is domiciled *or is found* . . . ." (Emphasis supplied).

13

determination regarding the need for a guardianship relationship in the first place.[22]

And if the probate court finds that guardianship is warranted, it must then evaluate whether appointment of the person seeking guardianship is in the best interests of the ward, not whether clear and convincing evidence supports the appointment of any particular guardian.[23] In the case *sub judice*, it was undisputed by the parties and the professionals who examined M. P. that he satisfied the standard set forth in OCGA § 29-4-1 (c) and was in need of a guardian. In granting guardianship to Milton, the court noted that there was a medical evaluation concluding that M. P. needed a guardian, the only proposed guardian before the court was Milton, and there was no

---

[22] *See* OCGA § 29-4-12 (d) (4) ("The court shall utilize the criteria in Code Section 29-4-1 to determine whether there is *clear and convincing evidence of the need for a guardianship* in light of the evidence taken at the hearing." (emphasis supplied)); *see also* OCGA § 29-4-1 (a) ("The court may appoint a guardian for an adult only if the court finds the adult lacks sufficient capacity to make or communicate significant responsible decisions concerning his or her health or safety.").

[23] *See* OCGA § 29-4-1 (c) ("No guardian shall be appointed for an adult unless the appointment is in the best interest of the adult."); *Cruver v. Mitchell*, 289 Ga. App. 145, 148 (2) (656 SE2d 269) (2008) ("Under Georgia law, . . . a guardian may be appointed for an adult if the court finds the adult lacks sufficient capacity to make or communicate significant responsible decisions concerning his or her health or safety. The inquiry focuses on the condition and best interest of the adult, not on whether the adult's family to date has been able to act successfully on her behalf without a guardianship." (citation and punctuation omitted)).

evidence that Milton was unfit to be M. P.'s guardian. Thus, regardless of the particular language used by the probate court, it at least implicitly found that the appointment of Milton as guardian was in M. P.'s best interests.[24]

Further, the court's finding in this regard is supported by at least some evidence because the attorney who interviewed and evaluated M. P. reported that granting Milton's guardianship interest would be in M. P.'s best interests. Specifically, the attorney's report stated:

The petitioner, [M. P.'s] father[,] stated that he wanted the guardianship so that he could enroll [M. P.] in the Coastal Development Center and

---

[24] We note that, at some point during the hearing, the probate court reminded the parties that the issue of whether Yolanda was an appropriate guardian for M. P. was not before the court. Instead, the court explained, the issue before the court was whether *Milton* was an appropriate person to be M. P.'s guardian. In response, Yolanda's counsel indicated that he agreed with the court's statements. On appeal, Yolanda argues that, although she did not file a petition for guardianship, the pleadings were amended to raise this issue when it was litigated, without objection, at the hearing. *See* OCGA § 9-11-15(b) ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."). But here, the parties did not litigate whether Yolanda should be appointed as M. P.'s guardian. Indeed, she agreed that she was *not* seeking guardianship of M. P in Georgia, as she intended to do so in North Carolina. And although Yolanda's testimony insinuated that M. P. should live with her in North Carolina, she ultimately argued that the probate court should deny Milton's guardianship petition so that she could seek guardianship in North Carolina, or at the very least, hold its ruling in abeyance for 90 days until she was able to do so.

15

assist him with other matters. I agree that this would be in his best interest.

I concur that it would be in M. P.'s best interest for the Court to appoint a guardian. Due to the willingness of his father to serve in this role and [M. P.'s] desire to remain with this father, [M. P.] would be best served if the Court appointed [Milton] as his [g]uardian.

In sum, Yolanda is incorrect that the probate court's selection of a guardian must be supported by clear and convincing evidence, and in this case, the probate court correctly considered whether granting guardianship to Milton was in M. P.'s best interests. Because there is evidence to support the probate court's apparent conclusion that granting Milton's petition for guardianship was in M. P.'s best interests, we must uphold its decision on appeal.[25]

3. Lastly, Yolanda argues that the probate court erred in applying an incorrect standard of proof for selecting a guardian when it required her to prove that Milton

---

[25] *See Glaze v. Lemaster*, 279 Ga. 361, 362 (2) (613 SE2d 617) (2005) ("[When], as here, the findings of the probate court are supported by any evidence, they will not be disturbed on appeal." (punctuation omitted)); *Cruver*, 289 Ga. App. at 147 (1) (b) (656 SE2d 269) (2008) ("We will not set aside the probate court's findings unless they are clearly erroneous. And [when] such findings are supported by any evidence, they will be upheld on appeal." (citation omitted)).

was unfit to serve as M. P.'s guardian, which is a "much higher standard of proof than merely proving oneself to be better suited than another to serve as guardian." In support, she references only the probate court's statement that there had been no evidence that Milton was unfit to be M. P.'s guardian. However, there is nothing in the record to suggest that the probate court placed any burden of proof on Yolanda to show that Milton is not fit to be M. P.'s guardian. Indeed, merely because the probate court acknowledged the fact that there was no evidence that Milton was unfit to be M. P.'s guardian does not mean that the petition would automatically be granted unless Yolanda proved otherwise. Regardless, our discussion and holding in Division 2, *supra*, establishes that the probate court applied the correct standard of proof in finding that granting Milton's guardianship petition was in M. P.'s best interests.

For all of the foregoing reasons, we affirm the probate court's grant of guardianship to Milton.

*Judgment affirmed. Phipps, P. J., and Peterson, J., concur.*

17